**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**

v.

Criminal No.   14-108

**JASON T. KOREY**,

Defendant.

## OPINION

CONTI, Chief District Judge

Pending before the court is a motion to suppress evidence seized during a search of the residence of Jason T. Korey ("Korey" or "defendant") on April 17, 2014, (ECF No. 26), and a motion for discovery with respect to a search and seizure policy of the United States Probation Office ("USPO"), (ECF No. 27). On April 29, 2014, a federal grand jury in the Western District of Pennsylvania returned a one-count indictment charging Korey with possession of a firearm and ammunition by a convicted felon, on or about April 17, 2014, a violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) On May 14, 2014, Korey pleaded not guilty to count one of the indictment. (ECF No. 17.) On October 9, 2014, Korey filed a motion to suppress evidence, (ECF No. 26), and a motion for discovery, (ECF No. 27). On November 6, 2014, the government filed an omnibus response to Korey's motions. (ECF No. 37.)

On November 24, 2014, the court held a hearing with respect to Korey's motion to suppress and motion for discovery.[1] (H.T. 11/24/14 (ECF No. 40).) The court heard testimony

---

[1] Korey filed the motion to suppress (ECF No. 26) and motion for discovery (ECF No. 27) along with five other discovery motions (ECF Nos. 28, 29, 30, 31, 32). The court at the November 24, 2014, hearing decided the five other discovery motions on the record. Accordingly, the only motions pending before the court are Korey's motion to suppress (ECF No. 26) and motion for discovery (ECF No. 27).

from Marcus White ("White"), a probation officer for the USPO, and exhibits were entered into evidence. (Id.) The court ordered the parties to file proposed findings of fact and conclusions of law with respect to Korey's motion to suppress, and supplemental briefing with respect to Korey's discovery request for the USPO's search and seizure policy. (Id. at 19, 75.)

On December 4, 2014, the government filed its supplemental brief with respect to Korey's discovery request. (ECF No. 38.) On December 29, 2014, Korey filed a response to the government's supplemental brief. (ECF No. 44.) On January 22, 2015, the parties filed their proposed findings of fact and conclusions of law. (ECF Nos. 46, 47.)

## I. Motion to Suppress

After considering the parties' submissions and the evidence presented at the suppression hearing, the court makes the following findings of fact and conclusions of law with respect to Korey's motion to supress:

### A. Findings of Fact

#### The "2005 case"

1.     In 2005, Korey in a separate federal criminal action, i.e., United States v. Korey, Crim. Action No. 04-15 (W.D. Pa. Feb. 4, 2004) (the "2005 case"), was sentenced to a term of imprisonment of 393 months and a term of supervised release of five years. (Crim. Action No. 04-15, ECF No. 85.)

2.     On May 31, 2013, the court in the 2005 case determined Korey violated conditions of his supervised release, revoked Korey's term of supervised release, sentenced him to a term of imprisonment of thirteen months, and a term of supervised release of twenty-four months. (Crim. Action No. 04-15, ECF No. 160.) The court imposed upon Korey several conditions of supervised release, including—but not limited to—the following conditions:

- The defendant shall submit his person, property, house, residence, vehicle, papers, business or place of employment, to a search conducted by a United Sates Probation/pretrial Services Officer at a reasonable time and in a reasonable manner based upon reasonable suspicion of contraband or evidence of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to searches pursuant to this condition.

- The defendant shall not commit another federal, state, or local crime.

- The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

- The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer.

- The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

(Crim. Action No. 04-15, ECF Nos. 131, 160.)

3. White was assigned to supervise Korey while he served his two-year term of supervised release in the 2005 case. (H.T. 11/24/14 (ECF No. 40) at 34.)

### Korey's Criminal Summons Issued on January 13, 2014

4. On January 13, 2014, an officer with the Baldwin Police Department pulled Korey over while he was driving his mother's vehicle, a 2002 green Chevy Cavalier, and issued him criminal summons for "fleeing or attempting to elude police officer" and "driving while operating privileges is suspended or revoked." (Gov't Ex. 1 at 5; H.T. 11/24/14 (ECF No. 40) at 35, 39.) The narrative signed by the reporting officer from the Baldwin Borough Police Department read, in part, as follows:

> As soon as I pulled out to get behind Korey he greatly accelerated in an attempt to evade me. Korey continued to speed on Churchview Avenue until he reached Greenglen Drive. At Greenglen Korey made a right turn at an unsafe speed without signaling. Korey proceeded down Greenglen accelerating the entire way. As Korey approached the bottom of Greenglen he abruptly pulled his vehicle to

the side of the road partially blocking a driveway. He turned the vehicles engine off and exited the vehicle attempting to leave the scene.

I stopped Korey and asked him about his actions. Korey stated to me that he didn't want to get a ticket for a suspended license so he was attempting to lose me to get enough space to get out of the vehicle and run away. Korey had a large fixed blade knife concealed in his waistband that he said he carried for protection.

(Gov't Ex. 1 at 5.)

5.      White received notice of Korey's encounter with the Baldwin Borough Police Department from the National Crime Information Center ("NCIC"). White learned from the NCIC that the Baldwin Borough Police Department "ran" Korey's name and date of birth. White conducted a criminal record search and learned the Baldwin Police Department charged Korey with "fleeing or attempting to elude police officer" and "driving while operating privileges is suspended or revoked." (H.T. 11/24/14 (ECF No. 40) at 35.) White obtained a copy of the police report with respect to the January 13, 2014, incident, and learned the police officer who stopped Korey found a large fixed blade knife on Korey's person. (Id. at 36.)

6.      Upon learning about Korey's encounter with the Baldwin Police Department on January 13, 2014, White became concerned that Korey violated the following conditions of his supervised release: (1) the defendant shall not commit another federal, state, or local crime; and (2) the defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Id. at 36-37.)

### Shooting Involving Mooney's Bar on March 9, 2014

7.      On March 9, 2014, officers from the City of Pittsburgh Bureau of Police responded to a call for "shots fired" placed by the owner of Mooney's Bar, who told dispatch that "he ran outside picked up a firearm went back in the bar then it sounded as if someone was trying to kick in the door of the business." (Gov't Ex. 2 at 2; H.T. 11/24/14 (ECF No. 40) at 37.)

The owner of Mooney's Bar also told dispatch "that there was a white male wearing a red hoodie across the street that was possibly involved." (Gov't Ex. 2 at 2.)

8.    A responding police officer encountered a man named Ryan Murtaugh ("Murtaugh"), who was wearing a red hoodie sweatshirt and blue jeans, standing outside the bar next to a vehicle, i.e., a 2002 green Chevy Cavalier, owned by Korey's mother. (Gov't Ex. 2 at 2; H.T. 11/24/14 (ECF No. 40) at 38.) The police report provides the following information with respect to the responding officer's encounter with Murtaugh:

> Murtaugh first stated that he was the passenger of the vehicle, then stated he was driving down Sankey about to make the right onto Brownsville Rd. when he heard one shot coming from the rear of the vehicle. He then turned right onto Brownsville and heard several more shots. He then pulled over across the street from Mooney's. He and his passenger, whom he stated was Jason Korey, then exited the vehicle and ran.

(Gov't Ex. 2 at 2.)

9.    An eyewitness provided an account of the shooting to two responding police officers. The police report provides the following information with respect to the eyewitness' account of the shooting:

> While Unit 3311 were clearing the scene they were flagged down by [a witness]. [The witness] told [the officers] that she was inside her vehicle directly behind the green Chevy Cavalier. [The witness] stated that the vehicle was stopped almost into the intersection so that they could see down Brownsville Rd. At which point she stated that she saw the front seat passenger and the right rear passenger each stick a firearm out of the window and fired an unknown amount of rounds down the 2600 block of Brownsville Rd. Fearing for her life she left the area.

 (Gov't Ex. 2 at 3; H.T. 11/24/14 (ECF No. 40) at 37-39.)

10.    White learned about the March 9, 2014, shooting from the "Pittsburgh Intelligence Police Bureau," which claimed Korey was involved in the incident. White also received the "investigative reports" which provided details about the incident. (H.T. 11/24/14 (ECF No. 40) at 37.)

**Murtaugh's Criminal Summons for DUI Issued on March 10, 2014**

11.     On March 10, 2014—the day after the shooting involving Mooney's bar—an officer with the Baldwin Borough Police Department stopped a 2003 white Cadillac Deville driven by Murtaugh because the officer suspected Murtaugh was driving under the influence ("DUI"). (Gov't Ex. 3; H.T. 11/24/14 (ECF No. 40) at 40.)  Korey was a passenger in the 2003 white Cadillac Deville driven by Murtaugh when it was stopped. (Gov't Ex. 3 at 2; H.T. 11/24/14 (ECF No. 40) at 40.) The police officer conducted a search of the vehicle driven by Murtaugh and recovered from the trunk of the car a blue grocery bag containing two hypodermic needles, two empty stamp bags, alcohol prep pads and cotton balls. (Gov't Ex. 3 at 4.)

12.     Murtaugh was charged via criminal summons for DUI. (Gov't Ex. 3 at 4.) The police report with respect to the March 10, 2014, incident indicates that following a hospital visit, the issuing police officer "transported [Murtaugh] to Koreys [sic] residence…where he [was] staying." (Id.)

13.     White performed a background check on Murtaugh and learned he is "a convicted felon for possession of a firearm." (H.T. 11/24/14 (ECF No. 40) at 40.)

14.     Upon learning about the shooting involving Mooney's Bar on March 9, 2014, and Murtaugh being charged with DUI on March 10, 2014, White became concerned that Korey violated the following conditions of his supervised release: (1) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer; (2) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered; and (3) the defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Id. at 40-41.)

**Missing Items Reported to Police by Murtaugh on March 11, 2014**

15.    On March 11, 2014—the day after Murtaugh was issued a criminal summons for DUI—Murtaugh contacted the Baldwin Borough Police Department. (Gov't Ex. 3 at 9; H.T. 11/24/14 (ECF No. 40) at 41-43.) Murtaugh told a police officer from the Baldwin Borough Police Department that prior to the DUI incident, he lived with Korey, but after Murtaugh was processed for the DUI, Korey told him not to come to his residence because Korey's mother "did not want him there." (Gov't Ex. 3 at 10.) On March 11, 2014, Murtaugh arranged to retrieve his belongings from Korey's residence. Korey agreed to gather Murtaugh's belongings and have them ready for Murtaugh when he arrived at the residence. Murtaugh reported to the Baldwin Borough Police Department that when he went to retrieve his belongings from Korey's residence, his prescription medication, i.e., "8 sublingual strips of suboxone and 20 gabapentin pills," and a one hundred-dollar bill, were missing. (Id.)

16.    Upon learning about Murtaugh's report to the Baldwin Borough Police Department with respect to the missing prescription medication and money, White became concerned that there were prescription drugs at Korey's residence. (H.T. 11/24/14 (ECF No. 40) at 43.)

**White's Initial Request to Search Korey's Residence Made on March 13, 2014**

17.    On or about March 13, 2014, White requested permission from his supervisor, the chief probation officer, to search Korey's residence for evidence that Korey violated conditions of his supervised release. (H.T. 11/24/14 (ECF No. 40) at 43.) White, in his request, informed his supervisor about Korey's criminal summons issued on January 13, 2014, the circumstances surrounding the shooting involving Mooney's Bar on March 9, 2014, and the circumstances surrounding Murtaugh's criminal summons for DUI on March 10, 2014. (H.T. 11/24/14 (ECF

No. 40) at 57-58.)

18.     White's request to search Korey's residence for evidence that Korey violated conditions of his supervised release initially was not approved by the chief probation officer. (Id. at 58.)

19.     Following White's initial request to search Korey's residence, White continued to receive information about Korey that he believed gave him reasonable suspicion to search Korey's residence for evidence that Korey violated conditions of his supervised release. (H.T. 11/24/14 (ECF No. 40) at 43.)

**White Learns about Korey's Activities at the Rivers Casino on March 20, 2014**

20.     On March 20, 2014, a Pennsylvania State Police Officer notified White that from December 2013, through March 2014, Korey was involved with a large sum of money at Rivers Casino. The police officer informed White about the following:

> As for KOREY, based on his player's card he has $9,675.00 into this casino since 12/12/13 and he is actually up $4,995.
> …
> Sometimes these numbers from the casino can be deceiving. For example, if you put $50 in a slot machine and you win $100 on that spin, the machine will say you have $150. Let's say you play all of that $150 without winning. When I look at your players [sic] account, its [sic] going to say you have $150 in when in actuality, it was only $50 of your money that you came in with.

(Gov't Ex. 6 at 1-2; H.T. 11/24/14 (ECF No. 40) at 44-47.)

21.     From January 2014, through March 2014, Korey reported to White that he was employed by All Steam Cleaning, earned $1,080 per month, and spent $500 per month paying for an attorney. (H.T. 11/24/14 (ECF No. 40) at 45-46.) White ordered Korey to provide verification of his employment, i.e., a pay stub of his earnings. (Id. at 46.) Korey did not comply with White's request, and White was unable to verify Korey's employment with All Steam Cleaning. (Id.)

22.     Comparing Korey's reported monthly income, i.e., approximately $580 after legal fees, to the amount of money Korey was involved with at Rivers Casino, caused White to be concerned about Korey's compliance with the conditions of his supervised release. (H.T. 11/24/14 (ECF No. 40) at 46.)

### Korey's Criminal Summons for Retail Theft Issued on April 7, 2014

23.     On or about April 7, 2014, the Pleasant Hills Police Department issued Korey a criminal summons charging him with retail theft for attempting to steal $597.06 worth of merchandise from Kmart. (Gov't Ex. 4 at 1; H.T. 11/24/14 (ECF No. 40) at 47.)

24.     Upon learning about Korey being charged with retail theft, White became concerned that Korey violated the condition of supervised release prohibiting him from committing another federal, state, or local crime. White was also concerned that Korey was receiving illicit income, i.e., receiving income from committing crimes. (H.T. 11/24/14 (ECF No. 40) at 47.) White explained that he was concerned Korey was receiving illicit income because "[Korey] was participating in criminal activity and…there seemed to be a lifestyle inconsistency with the amount of money that he had at the casino." (Id.)

### White Receives Information about Korey from a Federal Agent on April 14, 2014

25.     On or about April 14, 2014, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF"), notified White that a confidential informant reported that Korey, who resides with his mother: (1) "has two different firearms hidden in his residence, a 9mm hidden behind a brick wall behind the house and a .40 caliber berretta hidden in a drop ceiling near the bathroom;" (2) "is known to rob 'weak' drug dealers as a way to gain income;" (3) "hangs out at the Rivers Casino about 3 times a week depending on how much money he has;" and (4) "robbed a narcotics trafficker that goes by the street name 'Less Nuts' for

approximately 16 ounces for [sic] cocaine." (Gov't Ex. 5 at 1; H.T. 11/24/14 (ECF No. 40) at 50-51.)

26.     The ATF agent in the email also wrote that Korey "aka [sic] 'lil J' [was] a known shooter in the area [and] currently resid[ed] with his mother." (Gov't Ex. 5.)

**White Receives Approval to Search Korey's Residence on or about April 15, 2014**

27.     Following White's initial request to search Korey's residence, White continued to verbally update his supervisor about the additional information he received about Korey violating conditions of supervised release, including the information White received from the ATF agent informing White that Korey was "a known shooter in the area" and that a confidential informant reported—among other things—that Korey had two firearms in his residence. (H.T. 11/24/14 (ECF No. 40) at 68, 75.)

28.     On or about April 15, 2014, White's supervisor approved his request to search Korey's residence for evidence that Korey violated conditions of his supervised release. (H.T. 11/24/14 (ECF No. 40) at 68-69.)

29.     From March 13, 2014, i.e., the date White initially requested permission from his supervisor to search Korey's residence, until on or about April 15, 2014, i.e., the date White received approval to conduct the search of Korey's residence, White and other USPO officers "conduct[ed] surveillance of [Korey's] residence, coordinate[d] with local law enforcement and other law enforcement to effect a search safely." (H.T. 11/24/14 (ECF No. 40) at 69; Gov't Ex. 6 at 1.)

**The Search of Korey's Residence on April 17, 2014**

30.     On April 15, 2014, another probation officer with the USPO, Michael Howard ("Howard"), presented a Petition for Warrant or Show Cause Hearing for Offender Under

10

Supervision (the "petition") in the 2005 case. (Crim. Action No. 04-15, ECF No. 163.) The petition advised the court about the following: (1) Korey's criminal summons for "fleeing or attempting to elude police officer" and "driving while operating privileges is suspended or revoked" issued on January 13, 2014; (2) Korey's criminal summons for retail theft issued on April 7, 2014; (3) the circumstances surrounding the March 9, 2014, shooting involving Mooney's Bar; (4) Korey's associations with Murtaugh; and (5) the circumstances surrounding Murtaugh's criminal summons for DUI on March 10, 2014. (Def.'s Ex. A (ECF No. 26-2) at 2-3.)

31.     On April 17, 2014, the court as a result of the filing of the petition in the 2005 case issued a warrant for Korey's arrest. (Crim. Action 04-15, ECF Nos. 163.)

32.     On the same day, White and other members of law enforcement searched Korey's residence for evidence of contraband or that Korey violated conditions of his supervised release. (Def.'s Ex. B at 1.) The following weapons and contraband were found and seized by the USPO as a result of the search:

- Black/black folding knife
- Black/stainless steel folding knife
- Stainless steel folding knife
- Unknown substance
- Stainless steel machete
- Beretta .40 caliber handgun: serial # BER017605M in Glock handgun case
- Glock 9mm magazine with 15 rounds of ammunition
- Taurus .45 caliber magazine: empty
- Box of American Eagle ammunition: 38 special caliber: 44 rounds
- Box of 9x18 caliber ammunition: brand unknown (box wrapped with black electrical tape)
- Accur 8 digital scale
- Digital scale (brand unknown)

(Id. at 1-2.)

33.     Following the search of Korey's residence, Howard filed a Supplemental Petition

for Warrant or Show Cause Hearing for Offender Under Supervision[2] (the "supplemental petition") in the 2005 case. (Crim. Action No. 04-15, ECF No. 166.) The supplemental petition informed the court about the search of Korey's residence that was conducted earlier that day and the items seized by the USPO during the search. (Id. at 2.)

34.    Howard prepared a Special Response Team Post Search Report (the "post search report"). (Def.'s Ex. B.) In the post search report, the section entitled "Reasonable Suspicion" provides:

> January 2014: The offender has a pending charge for Fleeing and Eluding, Driving Under Suspension. Subject was a passenger in a vehicle for DUI arrest where drugs/paraphernalia were found. Also, a knife was found on the defendant's person. He reported that he carries the knife for protection. The knife was not seized. December 2013—March 2014: Subject spent $9,675 at Rivers Casino, in Pittsburgh, PA, however he is unemployed. March 9 2014, subject was a passenger in a vehicle were drug paraphernalia were found.

(Def.s Ex. B at 1.)

35.    White testified that the information contained in the post search report under the section entitled "Reasonable Suspicion" was the same information listed in the presearch report[3] under the section entitled "Reasonable Suspicion" that he submitted to his supervisor on March 13, 2014. (H.T. 11/24/14 (ECF No. 40) at 70-71.)

36.    On April 29, 2014, a federal grand jury in the Western District of Pennsylvania returned a one-count indictment charging Korey possession of a firearm and ammunition by a convicted felon, on or about April 17, 2014, a violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) The indictment charges Korey with knowingly possessing specific items seized during the April

---

[2] On April 28, 2014, the court in the 2005 case signed the supplemental petition and ordered "that the afore-cited violations/information relative to supervision be incorporated as part of the Petition Action previously made a part of the records in this case on April 17, 2014." (ECF No. 171 at 3.)

[3] The presearch report was not entered into evidence during the November 24, 2014, suppression hearing in this case.

17, 2014, search of his residence, i.e., "a firearm and ammunition, namely a .40 caliber Beretta pistol bearing serial number BEZ017605M; a Glock 9 millimeter magainze containing 15 rounds of ammunition; a 45 caliber Taurus magazine; 44 rounds of American Eagle 38 Special ammunition; and 43 rounds of 9x18 Colby ammunition." (ECF No. 1 at 1-2.)

37.    Korey argues the items seized during the April 17, 2014, search of his residence, which form the basis of the indictment in this case, should be suppressed because the USPO did not have reasonable suspicion that he possessed contraband or evidence of a violation of a condition of supervision in his residence. (ECF Nos. 26, 47.)

## B.  Conclusions of Law

1.    As a general rule, the burden of proof is on the defendant who seeks to suppress evidence.  United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant establishes a basis for his motion, however, "the burden shifts to the government to show that the search or seizure was reasonable" by a preponderance of the evidence. Id.; United States v. Matlock, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). For the purposes of this opinion, the court will assume Korey met his burden to establish a basis for his motion to suppress, and will analyze whether the government met its burden to show that it is more likely than not that the April 17, 2014, search of Korey's residence was reasonable under the Fourth Amendment to the United States Constitution.

2.    The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

3.    The Fourth Amendment generally requires law enforcement to secure a warrant

supported by probable cause before conducting a search. <u>Maryland v. Dyson</u>, 527 U.S. 465, 466 (1999) (citing <u>California v. Carney</u>, 471 U.S. 386, 390-91 (1985)). In accordance with the Fourth Amendment, however, a probation officer may conduct a warrantless search of a supervisee's residence, when the warrantless search is supported by *reasonable suspicion* and authorized by a condition of supervised release. <u>See</u> <u>United States v. Knights</u>, 534 U.S. 112, 121 (2001) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.")

4.      Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (citing <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)). "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990).

5.      The court must look at the "'totality of the circumstances—the whole picture'" surrounding a case to determine whether a law enforcement officer had reasonable suspicion to conduct a warrantless search. <u>Navarette v. California</u>, 134 S.Ct. 1683, 1687 (2014) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981)). A law enforcement "officer must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity" to establish the existence of reasonable suspicion. <u>Illinois</u>, 528 U.S. at 123-24 (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 27 (1968)).

6.      The Court of Appeals for the Third Circuit has explained that "'[r]easonable suspicion must be based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. Harple, 202 F.3d 194, 196 (3d Cir. 1999) (quoting United States v. Rickus, 737 F.2d 360, 365 (3d Cir. 1984)).

7.      Reasonable suspicion may be based upon a law enforcement officer's personal observations or information supplied by another person. Navarette, 134 S.Ct. at 1688. Like all information relied upon by a law enforcement officer, information supplied by another person is subject to a reliability analysis; indeed, "[r]easonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability." Alabama, 496 U.S. at 330. "Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Id., 496 U.S. at 331.

8.      Korey concedes that pursuant to the conditions of his supervised release with respect to the 2005 case, a probation officer could search his residence, among other places and things, "'based upon reasonable suspicion of contraband or evidence of a violation of a condition of supervision." (ECF No. 26 at 1 (quoting Crim. Action No. 04-15, ECF Nos. 131, 160).)

9.      Accordingly, the relevant inquiry in this case is whether prior to searching Korey's residence on April 17, 2014, White had reasonable suspicion that the residence contained contraband or evidence of a violation of a condition of supervision.

10.     The government argues White had reasonable suspicion to believe a search of Korey's residence would find evidence of Korey's: (1) possession of firearms; (2) illicit income earned form violations of local, state, or federal law; and (3) fraternization with a convicted

15

felon, i.e., Murtaugh. Each of the government's contentions will be addressed below.

**Evidence of Korey's possession of firearms**

11.     At the time White conducted the search of Korey's residence, he knew the following information with respect to Korey's alleged involvement with firearms:

-   On January 13, 2014, Korey was pulled over driving his mother's green 2002 Chevy Cavalier by a police officer and issued criminal summons for "fleeing or attempting to elude police officer" and "driving while operating privileges is suspended or revoked." (Gov't Ex. 1 at 5; H.T. 11/24/14 (ECF No. 40) at 35, 39.)

-   Korey was implicated—but not charged—in the shooting involving Mooney's Bar. An independent eyewitness to the shooting told police that she saw the driver and right rear passenger of a green Chevy Cavalier "each stick a firearm out of the window" and fire an unknown amount of rounds into the street. When police officers arrived on the scene, they found Murtaugh standing near a green 2002 Chevy Cavalier, which belonged to Korey's mother. Murtaugh told police he drove the green Chevy Cavalier, and Korey was a passenger in the vehicle, but Korey fled the scene once Murtaugh parked the vehicle. (Gov't Ex. 2 at 2; H.T. 11/24/14 (ECF No. 40) at 38.)

-   Korey was a passenger in the vehicle driven by Murtaugh when Murtaugh was issued a criminal summons for DUI. Following the issuance of the criminal summons for DUI, police officers transported Murtaugh to Korey's residence because that is where Murtaugh was "staying." (Gov't Ex. 3 at 4.)

-   Murtaugh is "a convicted felon for possession of a firearm." (H.T. 11/24/14 (ECF No. 40) at 40.)

-   An ATF agent reported that Korey was also known as "lil J" and was a "known shooter in the area" who resided with his mother. (Gov't Ex. 5.) A confidential informant told the ATF agent that with respect to Korey's alleged possession of a firearm, Korey: (1) "has two different firearms hidden in his residence, a 9mm hidden behind a brick wall behind the house and a .40 caliber berretta hidden in a drop ceiling near the bathroom;" (2) "is known to rob 'weak' drug dealers as a way to gain income;" (3) "hangs out at the Rivers Casino about 3 times a week depending on how much money he has;" and (4) "robbed a narcotics trafficker that goes by the street name 'Less Nuts' for approximately 16 ounces for [sic] cocaine." (Gov't Ex. 5 at 1; H.T. 11/24/14 (ECF No. 40) at 50-51.)

12.     Based upon the foregoing information, which was known to White prior to the

April 17, 2014, search of Korey's residence, White had reasonable suspicion to believe evidence that Korey possessed a firearm—a violation of the law prohibiting a felon from possessing a firearm and Korey's conditions of release prohibiting the same—would be found in Korey's residence.

13.     The January 13, 2014, incident during which Korey was issued two criminal summons showed that Korey previously drove his mother's 2002 green Chevy Cavalier, which was the same vehicle found on-scene by police during their investigation of the shooting involving Mooney's Bar. An eyewitness told the responding police officers that she was directly behind the vehicle, which belonged to Korey's mother, when she saw *two* occupants of the vehicle each stick their arm and a firearm out of the vehicle. Murtaugh told the police officers that he drove the vehicle, and Korey was a passenger in the vehicle. One firearm was recovered by the owner of Mooney's Bar, but the police reports do not indicate the whereabouts of the alleged second firearm. White at the time of the April 17, 2014, search knew Murtaugh—who previously was convicted for being a felon in possession of a firearm and associated in public with Korey—was living with Korey at the time of the shooting involving Mooney's Bar. Along with the foregoing information, White learned from an ATF agent that Korey was known as a "shooter" to the ATF and a confidential informant reported that there were two firearms in Korey's residence, and Korey was known to rob drug dealers. Considering all this information, i.e., the totality of the circumstances, White had specific and articulable facts, which, taken together with rational inferences from those facts gave him much more than a mere hunch that Korey had at least one firearm in his residence.

14.     Korey sets forth a number of arguments in his submissions to support his position that White did not have reasonable suspicion that firearms would be found in a search of his

residence. Korey's arguments, however, do not suffice to show the April 17, 2014, search of his residence was unreasonable.

15.    Korey argues that with respect the shooting involving Mooney's Bar, he was not arrested, no charges were filed against him, and he was not on-scene following the alleged shooting. Police officers must have probable cause to arrest and charge an individual with a crime. Gerstein v. Pugh, 420 U.S. 103, 111-12 (1975). Pursuant to Korey's conditions of supervised release, White needed only *reasonable suspicion* that contraband or evidence of a violation of a condition of supervision would be found in Korey's residence to conduct a search of Korey's residence within the confines of the Fourth Amendment. Accordingly, the police officers not arresting or filing charges against Korey for the shooting involving Mooney's Bar is not dispositive about whether White had *reasonable suspicion* that based upon the totality of the circumstances Korey had a firearm in his residence.

16.    With respect to Korey not being on-scene following the shooting involving Mooney's Bar, whether he was on-scene or not, he was implicated in the shooting based upon the following information: Korey's mother's vehicle, which Korey drove on January 13, 2014, was found near the scene of the shooting; Murtaugh told police officers that prior to their arrival to the scene, he drove Korey's mother's vehicle, and Korey was a passenger in the vehicle; and an eyewitness told police officers that she saw two occupants of Korey's mother's vehicle each stick a firearm out of a window of the vehicle and fire an unknown amount of rounds into the street.

17.    Korey argues that the email from the ATF agent "was insufficient to establish the reasonable suspicion necessary to authorize the search of Mr. Korey's residence" for the following reasons:

a. There was no mention of the email regarding a suspected weapon in the Office of Probation's Post Search Report of April 30, 2014, which itself was prepared nearly two weeks after the search of Mr. Korey's residence, thereby raising significant doubt as to whether the Office of Probation relied on it at all.

b. Despite the government's discovery obligations under Fed. R.Crim.P. 16, and despite defendant's filing of a Motion to Suppress on October 9, 2014, the government did not produce or disclose the existence of the email until just before the hearing on defendant's motion to suppress, raising further questions regarding the validity and reliability of the evidence.

c. The email indicated that the allegation that Mr. Korey had weapons on his premises came from a confidential informant, whose identity was unknown to the Office of Probation.

d. The email did not provide any information about the reliability of the informant.

e. The email did not provide any information regarding the motivation the informant may have had in making such an allegation.

f. The probation officer charged with making the reasonable suspicion determination made no inquiry into the reliability of the confidential source.

g. There was no information in the email regarding the date or time that weapons had been observed at Mr. Korey's residence, nor did the Office of Probation make further inquiry in that regard.

h. The email did not say, and the government did not demonstrate whether the confidential source's information was based on first-hand observation or had come from yet another third party, nor did the Office of Probation make further inquiry regarding such important matters.

(ECF No. 47 at 16.)

18.     With respect to Korey's first argument about the ATF agent email, i.e., White did not rely upon the email because it was not included in the post search report, White testified that he learned about the information contained in the ATF agent's email prior to the April 17, 2014, search, informed his supervisor about the information contained in the email prior to the April 17, 2014, search, and relied upon the information to form the basis of his reasonable suspicion to

conduct the April 17, 2014, search of Korey's residence. Whether the information contained in that email was included in the post search report, which was filled out by Howard, does not cast significant doubt on White's testimony that he knew about the information and relied upon it to form the basis of his reasonable suspicion to search Korey's residence.

19.     With respect to Korey's second argument, i.e., the reliability and validity of the email from the ATF agent is questionable because the government turned over the ATF agent email on November 24, 2014, the day of the suppression hearing in this case, Korey's counsel questioned White about the email during the hearing and did not elicit any testimony from White that calls into question the validity of the email the ATF agent sent to White. To the extent Korey questions the *reliability* of the information contained in the email, those arguments will be addressed below.

20.     Korey's remaining arguments with respect to the email the ATF agent sent to White concern the reliability of the confidential informant who provided the information contained in the email. As discussed above, reasonable suspicion is a less demanding standard than probable cause. <u>Illinois</u>, 528 U.S. at 123. Both standards, however, are "dependent upon both the content of information possessed by police and its degree of reliability." <u>Alabama</u>, 496 U.S. at 330. "Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." <u>Id.</u> at 331. In any event, "reasonable suspicion can arise from information that is *less reliable* than that required to show probable cause." <u>Id.</u> at 330 (emphasis added).

21.     Korey is correct that the probation office did not know the identity of the confidential source or his or her motivation in providing the information. The Court of Appeals for the Third Circuit has held, however, that "information received from other law enforcement

officials during the course of an investigation is generally presumed to be reliable...[and] government agents should generally be able to presume that information received from a sister governmental agency is accurate." United States v. Yusuf, 461 F.3d 374, 378 (3d Cir. 2006). Under Yusuf, the information given to White from an agent with the ATF, a government agency, was presumably reliable, and defendant presented no affidavit or statement of a reliable witness to show White had or should have had reason to doubt what the ATF agent told him. Id.

22.     In Yusuf, the court of appeals determined that an agent with the Federal Bureau of Investigations (the "FBI") did not act in reckless disregard of the truth when he relied upon erroneous information supplied by the Virgin Islands Bureau of Internal Revenue (the "VIBIR") in an affidavit of probable cause. Yusuf, 461 F.3d at 378. The court of appeals made this determination based upon the information presented to the district court at a Franks hearing and despite the FBI having done its own investigation which yielded results that conflicted with those of the VIBIR. Id. at 381. The court of appeals set forth a two-part inquiry for courts to apply to make the determination whether a government agent was reckless in relying upon information supplied by a sister government agency. Id. at 378. The test is as follows:

> To demonstrate that a government official acted recklessly in relying upon such information, a defendant must first show that the information would have put a reasonable official on notice that further investigation was required. If so, a defendant may establish that the officer acted recklessly by submitting evidence: (1) of a systemic failure on the agency's part to produce accurate information upon request; or (2) that the officer's particular investigation into possibly inaccurate information should have given the officer an obvious reason to doubt the accuracy of the information. Id.

Yusuf, 461 F.3d at 378.

23.     Korey did not provide any information to the court that shows White acted in reckless disregard of the truth when he relied upon the information provided by the ATF agent. Korey did not present any evidence to the court to suggest there was a systemic failure on the

ATF's part to produce accurate information upon request or that White's particular investigation into possibly inaccurate information should have given the officer an obvious reason to doubt the accuracy of the information; rather, much of the information provided by the confidential informant was supported by evidence already known to White at the time he received the ATF agent's email.

24.    With respect to the information provided by the confidential informant that Korey had two firearms in his home, White knew from police reports that Korey was implicated in the shooting involving Mooney's Bar, and while an eyewitness said she saw two firearms used in the shooting, only one firearm was recovered from the scene of the shooting.

25.    The information with respect to Korey frequenting Rivers Casino "about 3 times a week" is supported by the information White received from the state police officer reporting Korey's activities at Rivers Casino totaled approximately $10,000.

26.    The information with respect to Korey robbing drug dealers as a way to gain income is not directly supported by any of the information known to White at the time he received the email from the ATF agent. In light of *all* the information White knew at the time he received the email from the ATF agent, including information that Korey did not verify his income, however, there was nothing about any of the information provided by the ATF agent that should have given White "an obvious reason to doubt the accuracy of the information" provided by the ATF agent.   Yusuf, 461 F.3d at 378.

27.    Based upon the information known to White at the time he received the email from the ATF agent, it was not unreasonable for White to rely upon the information contained in the email to form the basis of his reasonable suspicion that a firearm would be found in a search of Korey's residence. Korey failed to show that the information contained in the email from the

ATF agent "would have put a reasonable official on notice that further investigation was required." Yusuf, 461 F.3d at 378. In other words, there is no evidence that White acted recklessly when he relied upon the information provided to him by the ATF agent to form the basis of reasonable suspicion to search Korey's residence.

28. Korey next argues that—other than the email White received from the ATF agent—there is no evidence connecting any alleged criminal activity by Korey to his residence. Firearms, however, "are…the type[] of evidence likely to be kept in a suspect's residence." United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) (citing United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988)); United States v. Steves, 525 F.2d 33, 38 (8th Cir. 1975); United States v. Rahn, 511 F.2d 290, 293 (10th Cir. 1975); Bastida v. Henderson, 487 F.2d 860, 863 (5th Cir. 1973).

29. Korey argues that the incidents forming the basis of White's reasonable suspicion with respect to Korey's possession of a firearm in his home are remote in time to the day of the search—April 17, 2014. The shooting involving Mooney's bar occurred on March 9, 2014, and the search of Korey's residence occurred five weeks later on April 17, 2014. Even if five weeks was determined to be "remote" in time from the day of the search, the Court of Appeals for the Third Circuit has recognized that "possession of weapons…is by its nature a continuous activity." United States v. Strickland, 237 F. App'x 773, 779 (3d Cir. 2007) (citing United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995)). Five weeks from the date of the shooting incident at Mooney's Bar to the search of Korey's residence, therefore, is not so remote in time that the government is unable to satisfy its burden to show White's search of Korey's residence was reasonable and within the confines of the Fourth Amendment.

30. Based upon the foregoing, the government met its burden to show it is more likely

than not that White's search of Korey's residence was supported by reasonable suspicion that a firearm would be found in the home. Korey's motion to suppress will, therefore, be denied.

**Evidence of illicit income earned from violations of local, state, or federal law**

31.    The government argues White had reasonable suspicion that a search of Korey's residence would produce evidence of illicit income earned from Korey's violations of local, state, or federal law. The information known to White at the time of the search, i.e., Korey could not verify his income, was engaged in substantial gambling at Rivers Casino, was issued a criminal summons for retail theft, and was known by at least one source to rob drug dealers, supported the conclusion that Korey was obtaining illicit income. White, therefore, had reasonable suspicion that a search of Korey's residence may produce evidence that Korey was obtaining illicit income, i.e., property, cash or drugs that Korey might have stolen.

**Evidence of fraternization with a convicted felon, i.e., Murtaugh**

32.    The government argues White had reasonable suspicion that a search of Korey's residence would produce evidence that Korey fraternized with Murtaugh, which was a violation of the condition of Korey's release to "not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer." (Crim. Action No. 04-15, ECF Nos. 131, 160.) White at the time of the April 17, 2014, search had evidence, i.e., police reports from the shooting involving Mooney's Bar, Murtaugh's criminal summons for DUI, and Murtaugh's reporting that he lived at Korey's residence prior to March 10, 2014, and his prescription medication was missing, that Korey and Murtaugh, who was a convicted felon, fraternized inside and outside Korey's home. Based upon the foregoing information and the reasonable inferences drawn therefrom, White at the time of the April 17, 2014, search had reasonable suspicion that evidence of Murtaugh living

at Korey's residence, i.e., the missing prescription medication, mail Murtaugh received at the home, or other items belonging to Murtaugh, would be found during a search of Korey's residence.

33. For all the reasons stated above, the motion to suppress must be denied.

## II. **Motion for Discovery**

Korey requests the government to disclose to him the USPO policy on search and seizures to "explor[e] the credibility of the government's representations regarding the claimed bases for the search[,]" but ***not*** "to argue that the search was unlawful for any failure to follow the Office of Probation's policies." (ECF No. 44 at 5.) The government argues the USPO's search and seizure policy "is not material to the preparation of the defense and…important institutional interests weigh against its disclosure." (ECF No. 38.) Based upon the review of the parties' submissions with respect to this issue and the court's *in camera* review of the USPO search and seizure policy at issue, Korey's request will be denied.

There is no general right to pretrial discovery in the criminal context analogous to discovery in the civil context. Instead, criminal pretrial discovery primarily is governed by Rule 16 of the Federal Rules of Criminal Procedure, as well as the government's obligations under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. 3500[4]. Rule 16 requires that the government produce certain categories of information upon request of the defendant: (1) the defendant's statements that are in written or recorded form (including grand jury testimony) and any oral statement given by the defendant to

---

[4]     The Jencks Act, 18 U.S.C. § 3500, requires the government to provide the defense with statements of witnesses that the government intends to call at trial. The Jencks Act protects discovery of such witnesses' statements, however, "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a); United States v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994).

a person then known by the defendant to be a government agent, FED. R. CRIM. P. 16(a)(1)(A) & (B); (2) the defendant's prior criminal record, FED. R. CRIM. P. 16(a)(1)(D); (3) all documents and tangible objects within the possession, custody or control of the government which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant, FED. R. CRIM. P. 16(a)(1)(E); (4) results or reports of physical or mental examinations or other types of scientific tests in the government's possession which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial, FED. R. CRIM. P. 16(a)(1)(F); and (5) a written summary of expert testimony the government intends to use during its case in chief at trial, FED. R. CRIM. P. 16(a)(1)(G).

Under Brady v. Maryland and its progeny, the government has the obligation to disclose to the defense exculpatory evidence—meaning evidence that is both *favorite* and *material* to the defense. The Third Circuit Court of Appeals explained in United States v. Higgs, 713 F.2d 39, 41-42 (1983):

> In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1967), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87, 83 S.Ct. at 1196–97. That rule has been expanded to require that, even though a defendant has not made a specific request for exculpatory material, the prosecutor is under a duty to volunteer evidence "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed." United States v. Agurs, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976).

Id. In addition, the court of appeals pointed out in Higgs that under the Supreme Court's decision in Giglio v. United States, 405 U.S. 150, 154 (1972):

> The rule laid out in Brady requiring disclosure of exculpatory evidence applies both to materials going to the heart of the defendant's guilt or innocence and to materials that might well alter the jury's judgment of the credibility of a crucial

prosecution witness.

Id. (citing Giglio, 405 U.S. 150 (1972).

Material must be both exculpatory to the accused and material in order for the prosecution to be required to disclose it under Brady and Giglio. Higgs, 713 F.2d at 42 ("Only if exculpatory evidence meets the appropriate test of materiality does the due process clause impose upon a prosecutor the duty to disclose that information to a defendant."). "The evidence is material [for Brady purposes] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).

The court conducted an *in camera* review of the USPO's search and seizure policy, and—mindful that Korey requests receipt of the USPO's search and seizure policy in order to attack the credibility of White—compared the USPO search and seizure policy to the testimony given by White at the suppression hearing in this case on November 24, 2014. Assuming White is a "crucial prosecution witness" because he initiated and conducted the search of Korey's residence during which the USPO seized the firearms and ammunition referred to in the indictment in this case, nothing contained in the USPO's search and seizure policy would alter the jury's judgment of White's credibility in such a way as to categorize the USPO's search and seizure policy as exculpatory information. Accordingly, the USPO's search and seizure policy is neither *material* to Korey's defense nor *exculpatory*. Korey's motion for discovery will, therefore, be denied.

### III. Conclusions

Upon consideration of the parties' filings, and the suppression hearing held on November

24, 2014, including the arguments made by counsel, testimony of White, and other evidence introduced at the hearing, and in accordance with the findings of fact and conclusions of law filed herewith, Korey's motion to suppress (ECF No. 26) will be denied, and Korey's motion for discovery (ECF No. 27) will be denied.

An appropriate order will be entered.

By the court,

Dated: February 20, 2015

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge